All right, back on the record for arguments this morning. We have one final case for argument. That is United States v. Wilson. Mr. Mason, whenever you want to proceed. Thank you. Good morning, Your Honors. May it please the Court, Caleb Mason representing Declan Wilson, who is the defendant below and the appellant here. I'd like to reserve three minutes for rebuttal, if I could. This is a criminal case. Declan Wilson was denied a fair trial. I want to go through four areas, and I want to focus on the first one, which is the legal standard that the District Court applied to the evaluation of third-party culpability evidence, what we called in the brief SODDI evidence. Somebody else did it is the heart of this. We developed, through the investigation of this case, a large amount of evidence of third-party culpability. This is a case in which a teenager died of a fentanyl overdose, about the most tragic thing that can happen in life. And the issue was, where did he get the pills that killed him? He had a lot of fentanyl in his blood when he died. About ten times potentially fatal dose. The evidence showed that he had been seeking and receiving drugs, specifically pills, from multiple sources, that he had been communicating with multiple sources of supply. My client was one of those, and there was no dispute in the evidence that my client had given him some pills, because my client and the decedent had a long text exchange that went on for hours about how to properly use the pills. Did you chew them or just swallow them? The decedent repeatedly told my client over a period of about four hours that his pills were weak and did not work. During that same period, the decedent was also texting on Snapchat with a man named Jose Arambula. Jose Arambula is the third-party culpability target here in this case that we wanted to put on evidence about, and the district court let us put on a few pieces of evidence. Well, the district court let you put on more than a few pieces of evidence, right? I mean, I'm looking, for example, at ER 1517, Agent Thomas' testimony, where you asked him, did he, meaning Arambula, also distribute, you testified earlier, that counterfeit M30 pills are the most common form of fentanyl pills. Yes, they are. Is that what Jose Arambula sold? Yes, it was. So you got in the text messages, but you also got in that he was the subject of this fentanyl indictment, and he was selling counterfeit pills with fentanyl. Yes, Your Honor. So on pages 24 and 25 of our opening brief, we put in bullet points about what was allowed and what was excluded. There was far more excluded than was allowed, and turning specifically to the testimony to which you allude, Judge Bennett, from Agent Thomas. Agent Thomas was the lead investigating officer. He was the DEA agent. We were prohibited from introducing the fact that Agent Thomas had arrested Jose Arambula not just for selling those pills, but for having 1,000 of them in his trunk. The jury never knew that. And that Agent Thomas, when he arrested Arambula... How long after was that? That was in September of 2021. So it was a year and three months. Fifteen months. So he had 1,000 pills 15 months later. He did, but then when he was asked about what he did for a living, he told Agent Thomas in that interview that he had been professionally selling these fentanyl pills for years, for at least three years. So in that interview, he described a period of time that included the transaction issue in this case. The night when Nathan Young died, that Arambula was texting with him on Snapchat. And he told Agent Thomas that during this entire period he had been a professional fentanyl dealer, that these were the pills that he sold, that he communicated with his clients on Snapchat, that he was scared because several of his clients had died. Were those the pills that matched the photos? Yes. Identical. Light blue in color, and they're labeled M30, and they look sort of like OxyContin, but they're actually fentanyl. All of that, what I just described, Your Honor, everything that I just said to you, all of that was excluded. So did you actually offer the statement, the transcript of Arambula? Yes. You offered it as a statement against penal interest? We offered the video and the transcript of the video, yes. And I attempted to elicit it through Agent Thomas. He was in the room. I also subpoenaed Arambula. I tried to rid him over from state custody. All of this was denied. The jury never heard about any of that. The jury also never heard about another drug transaction that Jose Arambula did that very same summer of 2020, August of 2020, now we're within three months, when Jose Arambula sold drugs to a young man, another teenager in the South Bay, exactly the same modus operandi, met him on Snapchat, delivered the drugs to him, and then the young man died of an overdose. Is it your position that when Arambula, if I'm remembering this correctly in the interview, said he had a couple of friends who died, is that one of them? Well, I believe that it was, but Agent Thomas never asked him, and I was not permitted to ask him, and I was not permitted to ask Agent Thomas. If, for example, the transcript had been admitted, was there evidence that would have let you argue that? There was, Your Honor. So what I did, and again, this was an investigation that the defense did. I did personally when I took over the case because the DEA had not done it. I got Jose Arambula's Snapchat client list. This was obtained, the government finally, after, you know, in 2022, finally did a subpoena for Arambula's Snapchat contact list. I took that contact list, I went to Snapchat, I subpoenaed the information for everybody, all the information Snapchat had about everybody in Jose Arambula's client list, and then I cross-checked that against death records for Los Angeles and Orange counties to see if there were individuals with the same names who had died of drug overdoses. And I found 50 of them, 50 people who had died of drug overdoses who had the same names as people in Jose Arambula's contact list during the period of time at issue. Again, all of that was excluded. The jury never heard any of that. And the government in this discussion, this series of discussions about this evidence, acted as Jose Arambula's defense attorney and argued, as they do on appeal, well, there's reasonable doubt as to whether or not all of those individuals died of drugs that they bought from Arambula. Maybe some of them bought them from somewhere else. Maybe some of them were name matches, so maybe not all 50 actually died of drug overdoses. We just don't know. There's uncertainty. I submit to the court, and this is really the gravamen of this appeal, that gets it backwards. I'm not a prosecutor. I haven't been a prosecutor for a long time. This is reverse 404B. My job in this case was to create reasonable doubt, and the defense is entitled to create reasonable doubt by showing that there is a reasonable likelihood that somebody else committed the crime. And the clearest place where this court has stated that standard is in the Urias-Espinoza case, which we discuss at length in our brief, the standard is relevance. The standard is, does this evidence of third-party culpability make it more likely than not? That's it. More likely that somebody else committed this crime, and if so, that is a legitimate avenue toward reasonable doubt. The Espinoza court also said explicitly and repeatedly that it is error for the district court to reject third-party culpability evidence on the grounds that the district court deems it to be speculative. Indeed, the court even used the term fantastical. It does not matter if the district court thinks that evidence is speculative or fantastical or unlikely. That is not the standard. The standard is relevance. And if we apply 404B here, the same way that it would be applied, were I prosecuting the case of United States v. Jose Arambula, we would look for motive, we would look for intent, we'd look for opportunity, we'd look for means, we'd look for absence of mistake. But even if it's relevant, the district court still could do a 403-404 balancing, right? Well, you can always do a 403 balancing. And the question is, what happened in this case? What happened in this case was the district court applied a legal standard. And we even went through, in the beginning of the reply brief, it's probably the best place where we aggregated all of these, because the government argued, well, he wasn't really applying the wrong standard. The district court absolutely was. The district court applied a standard that there had to be a direct connection. And he used the term connection a lot. He said, you have to show me Jose Arambula making that drug deal that night, and you have to do it through evidence of that drug deal. I'll let that come in. So I will let in the text messages between Jose Arambula and Nathan Young that night. I will not allow any evidence of anything else that Arambula did. You can have the fact, because the government stipulated, that Jose Arambula is a drug dealer who's been indicted. Other than that, no. So I was precluded from putting in anything about Jose Arambula's other actions. And I was also precluded from impeaching the government's investigation and the government's investigator by showing that they had a personal relationship. The lead DEA agent, Bob Thomas, signed Arambula up to be a cooperator. On that day when he arrested him with 1,000 fentanyl pills, he brought him into a room. This is all on video that I proffered as evidence in an attempt to introduce. Agent Thomas brought Arambula into a room after arresting him with 1,000 fentanyl pills, after Arambula told him that he'd been a professional fentanyl dealer selling pills to people on Snapchat for years, and that several people he thought had died because of his activities, and that was scaring him. What did Agent Thomas do? Let him go. Handed him back his phone, walked him out the door, and said, go on, do what you need to do, just don't get in trouble, and call me. Agent Thomas signed him up to be a cooperator and walked him out the door. The jury never knew that. This happened in September of 2021. While the Wilson investigation was ongoing, Agent Thomas spent another year and a half on the investigation of the Nathan Young death, focusing solely on Declan Wilson and not looking at Jose Arambula at all until I got on the case and started banging the gavel, and I don't have a gavel, I banged my fist, and urged the government to do so. Agent Thomas looked the other way consistently, and I was allowed to say that to the jury in closing, oh, Agent Thomas never investigated Arambula. What I was not allowed to do was say, why? Because he had a personal relationship with him and he'd signed him up to be a cooperator. That is something that a reasonable jury could have used when considering Agent Thomas' testimony, specifically when Agent Thomas testified that he thought Jose Arambula was just giving us, he put it, friendly advice to Nathan Young, when at Excerpts of Record 1057, Jose Arambula texted to Nathan Young, just take half of a half because they are strong. That's usage advice. We even brought in an expert to testify that drug dealers don't give general friendly usage advice to people they've never met. They give usage advice about drugs that they themselves have sold. Our expert was a 25-year veteran LAPD detective who spent eight years doing undercover drug transactions. Her name is Carla Zuniga. When was her last work in narcotics before the testimony? Well, it was 15 years earlier, and it was before social media and before fentanyl, and that's what the district court used as a basis for excluding her. But she also testified, and we had Voiradier, who brought her in and had questions and answers from both sides in the court, and she testified that drug-dealing lingo, practices, behaviors, they don't fundamentally change simply because of the technology being used, whether it's Snapchat today or pagers and phone calls when she was doing undercover work, and based on what the drug was. So if I could just ask a quick question, and this is kind of out of left field, but the indictment in this case, I don't know if you have it handy, because it hasn't really come up in the briefing, but it's at ER 1026. So it charges distribution, then resulting in death. Was there a special verdict form in this case, or was it just a general verdict as for the resulting in death? I don't know. I'm curious. That's a good question, and I wish I could simply quote you the answer. It's definitely in the record as to whether the court approved it. Here's why I'm asking. So let's presume for a second that, and I'm just speaking for myself, that I think there is a real problem with what happened here with the third-party defense. In your favor, I think the evidence that your client was dealing fentanyl is overwhelming. Whether the fentanyl resulted in death, that's a whole other story. Was there any verdict by the jury to say he's a fentanyl dealer, and then separately that it resulted in death, or was it just a general verdict? Because, again, what I'm trying to figure out here is that how much do you win in this case? If you're right on third-party culpability, is this a complete retrial, or is this something different than that? Your Honor, I don't want to make a representation about what the verdict form says, but I will be able to sit down and I'll look before I stand up for rebuttal and see what it said. Here's my answer to that. There was no evidence that Declan Wilson was a fentanyl dealer. There was overwhelming evidence. I agree with the court on that. I'm not going to contest this, that Declan Wilson gave Nathan Young pills that night. There is no evidence that those pills were fentanyl. And what is the evidence that we would look at? The first thing would be toxicology. Nathan Young died of a fentanyl overdose. But it was six hours after he took Nathan Young pills. Your point is everything still ties together, that you can't split it is what you're saying. That's absolutely right. That was my question. I think the evidence here is that Declan Wilson gave Nathan Young pills, but those pills did not contain fentanyl. I mean the strongest evidence for that is what Nathan Young himself said. Your pills don't work. Your pills are weak. And he said that for hours. When if you take a fatal fentanyl overdose of ten times the lethal amount, you're going to be unconscious within minutes. There's also no history of Declan Wilson dealing fentanyl at all. Contrast that with Jose Arambula who was arrested with a thousand fentanyl pills in his trunk and was a professional fentanyl dealer who knew that he was selling fentanyl. The jury never heard any of that. So I think to the court's question, if Declan Wilson gave pills to Nathan Young, but those pills did not have fentanyl in them and did not cause Nathan Young's death, Declan Wilson is simply innocent of these charges. I should have premised my thing that the evidence is overwhelming. He gave him something.  Okay, fair enough. Yeah, something. If I could, Your Honor, for 30 seconds, I just want to mention to the court that there are other issues aside from the third-party culpability. There's also the exclusion of two witnesses. I had two witnesses who took the same pills. They were in the same car. They took the same pills. They did not die. I had them live, ready to testify in court, and they were both excluded. They were excluded on the grounds that after the government intervened and asked the court to appoint counsel and warn them of their Fifth Amendment rights, both of these willing witnesses then pled the Fifth. They pled the Fifth even though there was no indication that there was any reasonable likelihood that they would be charged. In the case of Matt Hay, he was not charged with anything, and the government's suggestion that he might be charged was based on the fact that if he admitted taking a pill, he would be admitting to possessing narcotics. I don't think there's a reasonable likelihood that the U.S. Attorney's Office is going to prosecute anybody for possession of drugs when they admit to taking one pill years earlier, and there is no pill to put on for evidence. Secondly, with Becca Brownfield, she came in, and she was prepared to testify. She took the same pills. She didn't die. The government then moved to appoint counsel for her, and she thereupon took the Fifth. Becca had actually executed a declaration. So after the court accepted her Fifth Amendment plea and deemed her unavailable, I then moved to admit her declaration as a statement against penal interest, which you would think it must be if it was the basis for a Fifth Amendment invocation that the court accepted. At this point, the court reversed course and said, well, no, it's not actually against penal interest. So you cannot introduce it even though she's an unavailable witness. I mean it has to be one or the other, Your Honor. Either it was inculpatory and so her Fifth Amendment privilege was correctly invoked, in which case I should have been able to use her declaration. The same thing with Matt Hay. I mean, so you're saying that if the district court rejected on the grounds the district court did reject the declaration, then the district court should have ordered her under penalty of contempt to testify and not let her assert a Fifth Amendment privilege? Well, she was a willing witness until she was threatened with prosecution. But she did take the Fifth. She did, yes. So the answer to the court's question is yes. I mean there are two choices here. Either what she was going to say was inculpatory to the degree that she should be permitted to invoke, or it was not. And if it was not inculpatory to that degree, then she should have been ordered. But there's more to admitting a declaration against penal interest than that it's simply inculpatory. There is a second element that there has to be corroboration. Here there was multiple levels of corroboration. There was another live witness, Matt Hay. There was Declan Wilson's initial statement that there were multiple people in the car. There was Joshua Young's statement. Don't you also have to show that the person at the time they made the statement were aware of its inculpatory possibilities? Yes. And when she's testifying in court for the Fifth Amendment, it's what's going on then, not when she executed the statement, right? She executed the declaration about a week or two before she came to court. And she was represented by counsel then? No. But she was aware that there was a child going on, and she volunteered, and she had her father with her to come to court. So she was a willing witness. Okay, my time has expired. I will sit down now. Unless my colleagues have any other questions, I'll give you the three minutes that you asked for. Okay, thank you. Thank you. Good morning, and may it please the court. Danny Weiner on behalf of the United States. Defendant Wilson was permitted to meaningfully present a third-party defense at trial. He did so, and the jury rejected that argument. Counsel, do you think the district court correctly summarized the doctrine of third-party liability in terms of evidence that can be admitted? So if you look at the record, I don't think that there is a specific quote where the district court summarized or quoted what the exact law is here. But the entire record supports that the district court did exactly what the Supreme Court in Holmes, what this court in Armstrong, and even in Espinoza says to do, which is to evaluate under the rules of evidence, not just admissibility, whether or not this third-party evidence can come in. What the district court did here, and I think context is important, is that these conversations about what I'll call the Arambula-related evidence, which is the evidence at issue about third-party culpability, happened over multiple, very lengthy pretrial hearings or conferences, where defense counsel was given multiple opportunities to explain his evidence, to come forward with evidence proving or showing what the relevance or the evidence he had supporting his claims that Arambula, for example, caused 50 deaths, including of a 14-year-old, aside from the decedent in this case. And what the district court did acknowledge, there are quotes where he talks about minimal evidence or minimal connection, but that's precisely what the district court is supposed to do. The first step is to probe whether the evidence is relevant. So the district court's comments that, for example, there's no direct connection or it's minimally probative is unremarkable. What the district court did second is precisely what he's supposed to do under this court's law, as Judge Bennett pointed out, which is to evaluate the other factors outlined in Rule 403. And if you look at almost or every single bucket of evidence that was excluded by the district court, each time the district court outlines why under Rule 403 he's excluding it. So the evidence concerning SH, to me that's the most troubling for the government. It's close in time. It's a kid. It's Snapchat. It's the same username on Snapchat. So what did the district court say about why that was either not relevant or would be excluded under some other rule? Sure. So that's at Record Site 423. So at the pretrial conference where the death of SH, who is the 14-year-old, was brought up, the district court probed on multiple occasions and inquired of defense counsel what evidence, if any, he had that Arambula was the dealer who provided drugs that killed that 14-year-old child. Now, defense counsel cited potentially the testimony of a woman in the community who saw a message. That testimony or that evidence was not presented to the district court. The district court made clear on the record, I don't have that before me. All you're providing me is that Arambula and the 14-year-old were friends on Facebook and they had messaged. But in the record, as the government represented as well, there was evidence that that transaction never occurred. It discussed that with the district court, that, yes, they were friends on Snapchat, but there was no evidence that there was actually a consummation of a transaction, a discussion of price or location or anything like that. All right. But normally you don't prejudge facts. I mean, it was very odd to me what kind of happened here, where you had all these kind of mini hearings on whether the defense could prove something or not. Normally the trial is when you prove something. So in that situation, for example, we have one where the defense says that they have a witness that can show, and there is some evidence that the victim in this case and Arambula – I'm sorry, SH and Arambula were in communication with each other. I think the district court did have that before, correct? Yes, that's correct.  And then the defense is proffering that there's more to the story. So to me there's not an evidentiary issue here. I mean, there's not a – there is evidence that there is a relationship between SH and Arambula. So what then is the reason for excluding it at that point? Because at the – in context, taking a step back, what the district court was dealing with during these pretrial conferences was the defense's position that Jose Arambula had killed 51 people with drugs. The district court, as the gatekeeper of highly prejudicial – of prejudicial evidence, had to make a decision before trial started, which he gave the defendant multiple opportunities to do so. So what Judge Owens' question – I don't mean to leap in on this – was with regard to one person, not 50 people. And honestly, counsel, when I was a prosecutor and since I've been on the bench, if this were the reverse, I could see the government arguing if this person – if Arambula were the defendant being charged and that this were other crimes evidence. It's just, well, Your Honor, there's evidence that about the time they were communicating, we know he was a fentanyl dealer, and we know that this person died of exactly the same thing that the victim in this case died in. It goes to motive, it goes to intent, it goes to modus operandi. I mean, I just think we've all seen things like that admitted by the government, and I'm having a hard time seeing why this wasn't at least – why the district court erred in keeping that one out. So what the district court was mindful of with regards to this specific death of the 14-year-old, around the same time, also in the South Bay, acknowledge all of those similarities, was that that evidence, although on its face may seem similar, is extremely prejudicial if you don't have more than just the pure speculation that it happened. And so that's why the district court was engaging in that colloquy with defense counsel. But we do know that this poor person died of essentially the same thing that the victim in this case died of, right? I believe so, yes, of an overdose, yes. But of the same kind of drug, right? I'd have to check the record, but I do believe that he died of a fentanyl overdose, yes. Well, I mean, it seems to me that gets there. Well, and to jump in there, you said it's prejudicial. I mean, yeah, sometimes very powerful evidence is prejudicial. That's why the side wants to introduce it. Why was it unduly or unfairly prejudicial to the government? Because what the district court found was that it was unduly prejudicial given the speculative nature how probative it was. It's not that it was just prejudicial. Of course, prejudicial evidence comes in all the time, especially against a defendant. That's the crux of inculpatory evidence. But what a district court's job is to do, especially in a circumstance like this, is to weigh how prejudicial it is against the probative value that's being proffered at the time that the district court is making that decision. I'm just trying to see what's unfair about it. I mean, look, it may be that it's not very good evidence, and it happens all the time. I mean someone's accused of his wife, and they say, well, you know what? The night stalker was out there. It wasn't me. It was the night stalker who killed my wife. Why isn't this different than the night stalker? So if I could answer that question looping back in Judge Bennett's question about modus operandi. What Defendant Wilson was able to put in was precisely the type of modus operandi evidence against Defendant Arambula. The crux of the evidence he was able to put in showed his criminality, showed Arambula's criminality, and showed his modus operandi. Defendant was permitted to, number one, show that Arambula was a drug dealer on Snapchat, just like Defendant Wilson. Number two, that Arambula had conversations on Snapchat with the decedent, in this case, the night that the decedent died. It's a modus operandi. That number three, that I apologize, Judge Bennett. No, no, no, go ahead. And number three, that Jose Arambula was arrested or was indicted some 15 months later after the decedent's death for selling to undercover agents the exact same blue little M30 pills that contained fentanyl. So the crux of that argument that somehow Defendant Wilson was not able to show that Arambula had modus operandi, opportunity, or intent, it was all there. I don't want to repeat myself, but my problem is that the question in this case was whose pills killed this poor young man. And the fact that Arambula, who was talking to him that night, that there's evidence that he, right around that time, sold the same kind of pills that killed someone else, when the issue is whose pills killed this poor young man, it just seems to me that excluding that under 403 is an abuse of discretion. So I think it's important that the court also look at the messages between the decedent and Arambula. Arambula, during that conversation that night, they're discussing selling auxes, which are those fake M30 pills. So the defense had evidence from that evening that Jose Arambula was able and willing to sell those fake pills. But the fact that there was evidence from which a jury could conclude that right around that time he sold a pill to somebody, a teenager, that killed that teenager, that didn't come in. That is correct. So I'm trying to understand the argument you're making. Is it that it was properly excluded or that it was harmless error? Are you arguing both? Well, I'm not jumping to harmless error. The government maintains that it was properly excluded, that the district court did not abuse its discretion under Rule 403, excluding the death of the 14-year-old, because there was no evidence presented to the district court that that transaction between Arambula and the 14-year-old actually occurred. To the extent the panel thinks that excluding that one piece of evidence is error, it is harmless. There was for two reasons. Number one, that to the extent that evidence of the 14-year-old's death would show modus operandi, intent, opportunity, that evidence was in the record from the messages between Arambula and the decedent. That argument or that evidence was in the record from Special Agent Thomas' testimony about his spinoff investigation into Arambula. And second, it's harmless. And Judge Owens, you asked about the verdict form. At docket 140, I'm not sure it's in the appellate record, but at docket 140, it was a special verdict form. The jury found, number one, that the defendant distributed fentanyl, and number two, that the fentanyl caused the decedent's death in this case. There was overwhelming evidence at trial that the defendant delivered fentanyl to the decedent. If you look at text messages between the decedent and friends of his, sorry, I apologize, the defendant and friends of his that evening, for example, at record site 1059, the defendant brags to another friend that everyone in his car only did one pill each, and each was barred out. There was testimony in the record at 1532 that being barred out refers to being high. So the potency of the pills that defendant distributed to the decedent, there was overwhelming evidence of that. The people in defendant's car the night he distributed to the decedent took one of those pills, and they got high. In fact, if you look at also ER 245, later that afternoon after the decedent, I apologize, after the defendant delivered the pills to the decedent, he said that one of the women in his car, that's Ms. Rebecca Brownfield, threw up. It's possible that she also overdosed from those potent pills. So counsel, I don't think this is understandably addressed in the briefs, and I'm going to, on his rebuttal, ask your friend this. In the government's view, would the panel have the authority to say, just hypothetically, there was error here, it was harmful error vis-a-vis did it cause the death, but it wasn't harmful error vis-a-vis did he distribute fentanyl, or is that just something that in the government's view the panel would not have the authority to do? I'd request an opportunity to speak with other people in my office before I answer that question. We'd be happy to submit a letter. But on that point, I would just go back and say that the toxicological evidence in this case also provided overwhelming support for the jury's finding that it was defendant's fentanyl that caused the decedent's death. Dr. Sean Carstairs testified that even if the decedent took those pills potentially five or so hours before he died via chewing, the method by which the decedent ingested the pills, which was chewing, causes what's called a first-pass metabolism. You chew the pills. This is unlike snorting, which is how many people do take these M30s or fentanyl pills. You chew the pills. They go through the liver. They get metabolized by the system. And so it was entirely consistent with the decedent taking these pills potentially five or six hours before his death that he felt the effects and then died. So on the one hand, there was almost uncontroverted evidence that the defendant delivered pills to the decedent. The decedent posted those pictures, those five M30s, which there was testimony that those are the most common types of pressed fentanyl pills, that any of those pills can kill because they're produced in clandestine laboratories with absolutely no control, that people in defendant's car only took one and got high, and that the decedent took all five of those pills and died in the morning from a fentanyl overdose. I apologize for not knowing this. Was there any expert testimony with, say, a hypothetical like, I'm going to ask you to assume that both the defendant and Arambula provided pills to the victim that he took in this general sequence? Can you give us an opinion as to which of those or both of those caused the death of the decedent? Was there any testimony from anybody's expert which asked for an assumption that two people sold him fentanyl? No, I don't believe so. But the toxicological evidence that was presented in this case by Dr. Carstairs was fully consistent with the jury's finding that it was defendant's pills that killed the decedent. Thank you. Can I answer any more of the court's questions? I have one more question. Did you have something? No, I don't, thank you. So moving to something that really wasn't discussed a lot, but it was brought up, and it's certainly in the briefs, I'm having trouble understanding the district court's exclusion of the expert testimony that drug dealers don't give general advice given the testimony of the government's case agent on this and the fact that case agents and people in similar positions give evidence like this all the time about what standard practice is. And it would seem like in sort of this experiential type of expert testimony, testimony that, yeah, this is not something that typically would be done by a drug dealer who hadn't sold drugs, as opposed to just general advice. Why didn't the district court abuse its discretion in keeping that out? Sure, and there's one thing I do want to clarify. In Appellant's brief, and today I believe it was stated, that the government elicited this testimony. That's not accurate. If you look at ER 1574, the testimony that Agent Thomas gave about, quote, friendly advice of drug dealers was elicited on cross-examination. Okay. That's first. Second, under, so the district court excluded Ms. Zuniga's testimony, part of it under Rule 403, but the crux of it that's on appeal, which is the friendly advice, under Daubert. The district court made reliability findings, which are entitled to an abuse of discretion, that number one, the statement itself was not correct or reliable, that categorically drug dealers don't give friendly advice. And if you look at the declaration of Ms. Zuniga, and that's at 2233, this was a categorical sweeping statement. This was not a nuanced opinion. She said drug dealers don't give general advice. The district court did not find that statement to be helpful or reliable or correct, potentially. And second, I believe the panel asked about Ms. Zuniga's experience. The district court made clear, in excluding it, that her lack of experience was not representative of the times we live in today and the technology that exists. The district court applied its discretion in finding that her experience, which was dated to the early 2000s, albeit in narcotics, did not deal with smartphones or Snapchat communications, which this case was largely about. So the district court was proper in excluding that unreliable and incorrect testimony. All right, you've got ten seconds. I will heed Judge Owens' warning, and I will leave my four seconds on that. Thank you. Thank you, counsel. Mr. Mason, three minutes. Thank you, Your Honor. I will go through, in order of the notes I took, the government's presentation. First, let's start with the suggestion that the exclusion of this evidence was harmless. I think the best way, I've been thinking about how to articulate this. The best way to look at this is to look at my closing argument. It starts at 2035 of the excerpt's record. It goes about 40 pages. It's a good read. It's a good closing. Now, read it again and plug in all of the bullet points of the excluded evidence, and we've listed them for you both in the opening brief and in the beginning of the reply brief. All of the evidence that was excluded, the witnesses that were excluded, the expert testimony that was excluded, the information about Arambula that was excluded, plug that into the argument and ask yourself whether that argument would have been more persuasive in moving the jury on the issue of third-party culpability, and I think it's quite clear that it would have made a huge difference. Second, as far as the district court's reasons and the applicability of the Espinoza case, looking at the Espinoza case, there are a lot of memorable passages to quote. 517, this is 880F3rd, has one good one. We think, as we have explained, establishing a link between the third party and the crime, in other words, what the district court said here over and over again, you must show Arambula giving those drugs to Nathan Young, and if you don't have that, I'm not going to let you put it in. Here's what this court said. Establishing a link between the third party and the crime is not a threshold requirement for admissibility of third-party culpability evidence. In that same case, the district court, here's another quote, that the defense's theory may be speculative is not a valid reason to exclude evidence of third-party culpability. The district court is not free to dismiss logically relevant evidence as speculative. That is verbatim from this court. The district court applied this erroneous standard that this court has announced as erroneous, excluding the evidence because it was speculative in the district court's view. I disagree with that, and because it showed other acts and not direct the crime at issue. With respect to the young man, S.H., who died, government counsel just characterized that as defense said he would bring some woman from the community. It was his mother. I had her ready to come to court and testify, and she's the one who looked at his phone after he was dead and saw the text from Marambula. The government's claim that everything was harmless because I was allowed to make the argument of third-party culpability, that is, I think, the core, the crux of this case. I'm allowed to put in evidence as well. Simply being able to point the finger and say something is not enough. I should be allowed to put on the evidence. With that, Your Honor, my time has expired, and I appreciate the court's time. If the court has further questions, I'll be happy to answer them. Oh, yeah. Mr. Judge Bennett has a question for you. So as I asked your friend, does the defense have a position as to not whether it would be right to do it, but does the defense have a position as to whether the court would have the authority to say, hypothetically, there was error here, it was harmful as to the cause of the death, but it wasn't harmful as to distributed, so we're theoretically sending it back just on that? Yes, Your Honor. I thought about this as I was sitting there listening to the court's question. As I understand this particular statute, the mens rea runs to the intentional distribution of a substance believed by the defendant to be a controlled substance. As to whether or not the substance was actually fentanyl, that's a separate question, and then for the causing death, obviously that's an objective question that does not require an intent. Nobody suggests that Declan Wilson or most of the other defendants in these cases intended to cause anybody death. So I don't think, though, I mean given there was no mens rea as to the distribution of fentanyl, so my difficulty with that, and I agree with my colleague for the government that this is something that we should all go back and research, and perhaps we can submit 28J letters. I think if we remove the causing death, we may find ourselves back in an arena in which mens rea with respect to the drug is required, but by analogy with other types of trafficking cases in which there is no requirement that the defendant know the specific type of drug, I would probably lean that direction as to what it's going to be, in which case the court's suggestion I think would be within the court's power, but I will undertake to do that research and submit a 28J letter. I do think it would be helpful. I mean that was part of the reason why I was asking you the question is the same reason that Judge Bennett was asking the question. So yeah, I mean we can do a formal order if it would help, or you guys can, well, experienced advocates, you guys can get us 28Js. We'll make sure we read them before we file anything in this case. Thank you, Your Honor. Thank you, everybody. Very interesting case. Very well briefed. Very well argued. We really do appreciate it. This matter is submitted, and we're done for today. I'll rise.
judges: OWENS, BENNETT, THOMAS